PATRICK MCDONOUGH (SBN 288285)
MATT O'MALLEY (SBN 272802)
San Diego Coastkeeper
3900 Cleveland Ave., Ste. 102
San Diego, CA 92103
Ph: 619-758-7743
Email: patrick@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>            Plaintiffs,<br><br>       v.<br><br>PRETIUM PACKAGING, L.L.C., a Delaware Corporation,<br><br>            Defendant. | Civil Case No. **'22CV185  GPC BLM**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.  JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.     On December 7, 2021, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Defendant Pretium Packaging, LLC as owner and operator of the Facility located at 946 S. Andreasen Dr., Escondido, CA 92029 ("Pretium Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.     Plaintiffs also sent the Notice Letter to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and

in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

6.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Pretium Facility.

7.     Specifically, Defendant has discharged and continues to discharge polluted storm water from the Pretium Facility to downstream waters and groundwater including Escondido Creek, the San Elijo Lagoon, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.     Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the Clean Water Act and the IGP.

9.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Pretium Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

10.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

11.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

12.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, plastic, and other pollutants harm the special biological significance of

the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

13.    The polluted discharges from the Pretium Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

**III.    PARTIES**

14.    Pretium Packaging, LLC is an active Delaware corporation and is the Owner and/or Operator of the Facility.

15.    Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

16.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

18.     Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.     The violations of the IGP and CWA at the Pretium Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

20.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

21.     An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act.

22.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

23.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

24.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in

interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

25.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

26.    The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2.

27.    The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

28.    The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

**B.    California's IGP.**

29.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

30.    California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

31.    The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

32.    Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997

Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

33.     In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12; Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

34.     Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC codes 20XX through 39XX require coverage by the Permit. *Id*., Attachment A.

35.     Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.     The IGP Discharge Prohibitions.**

36.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." *Id*. § III.A.

37.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

38.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

39.     The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

40.     The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the

applicable receiving water quality objectives." Basin Plan at 4-20.

41.    Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.    The IGP Effluent Limitations.**

42.    The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

43.    Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

44.    Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

45.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

46.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa*

*Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

47.     Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

48.     The 2015 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0–9.0 s.u; .68 mg/L for N+N; .014 mg/L for copper; .082 mg/L for lead; .12 mg/L for zinc; and 1.0 mg/L for iron. 2015 MSGP Fact Sheet at 55–56.

49.     The 2021 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0–9.0 s.u; .68 mg/L for N+N; .00519 mg/L for copper; .082 mg/L for lead; and .12 mg/L for zinc. 2021 MSGP Fact Sheet at 80–81.

**E.     The IGP Receiving Water Limitations.**

50.     The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permits § VI.B.

51.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

52.     The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

53.     Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

54.     WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants

for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

55.     The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act section 303. 40 C.F.R. § 131.

56.     The Beneficial Uses for Escondido Creek downstream from the Pretium Facility include: municipal and domestic supply; agricultural supply; potential industrial service supply; contact water recreation; non-contact water recreation; warm freshwater habitat; cold freshwater habitat; and wildlife habitat. Basin Plan, Table 2-2.

57.     The Beneficial Uses for the San Elijo Lagoon include: contact water recreation; non-contact water recreation; wildlife habitat; preservation of biological habitats of special significance; estuarine habitat; marine habitat; spawning, reproduction, and/or early development; migration of aquatic organisms; and rare, threatened, or endangered species. *Id.*, Table 2-3.

58.     Pacific Ocean Beneficial Uses include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

59.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

60.     According to the 2016 303(d) List, Escondido Creek is impaired for benthic community effects, bifenthrin, DDT, indicator bacteria (such as enterococcus and E. coli), malathion, manganese, nitrogen, phosphate, selenium, sulfates, total dissolved solids, and toxicity.

61.     According to the Draft 2020/2022 303(d) List, which incorporates a much larger and more recent dataset, Escondido Creek is also impaired for phosphorus, turbidity, and iron, but not malathion.

*/././*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES      9

62.     According to the 2016 303(d) List, the San Elijo Lagoon is impaired for eutrophic conditions, indicator bacteria, sedimentation/siltation, and toxicity.

63.     According to the Draft 2020/2022 303(d) List, which incorporates a much larger and more recent dataset, San Elijo Lagoon is also impaired for dissolved oxygen and turbidity.

64.     Polluted discharges from industrial facilities, such as the Pretium Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

65.     The following WQS are established by the Basin Plan for Escondido Creek: nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-13; 3-26.

66.     The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

67.     Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

**F.      The IGP Storm Water Pollution Prevention Plan Requirements.**

68.     Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). 2015 & 2020 Permits §§ X.A–B.

69.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 2015 & 2020 Permits § X.

70.    The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id*. §§ X.A–I.

71.    Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The IGP require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

72.    The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id*. § XV.

### G.    The IGP Monitoring and Reporting Requirements.

73.    Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id*. §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

74.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

75.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

76.     A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id*. § XI.B.1.

77.     The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id*. § XI.B.2.

78.     Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

79.     Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

80.     Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

81.     Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

82.     Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

/./.

83.     Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

84.     All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id*. § XXI.K.

### H.     The IGP Plastic Materials Special Requirements.

85.     The 2015 and 2020 Permits require dischargers that handle Plastic Materials to implement BMPs to eliminate discharges of plastic in storm water in addition to all other requirements of the Permit. *Id*. § XVIII.A; Cal Water Code § 13367.

86.     "Plastic Materials are virgin and recycled plastic resin pellets, powders, flakes, powdered additives, regrind, dust, and other similar types of preproduction plastics with the potential to discharge or migrate off-site." 2015 & 2020 Permits § XVIII.A.

87.     Pursuant to California Water Code Section 13367, Plastics Facilities are subject to certain mandatory, minimum BMPs which include containment systems for plastic materials, sealed containers for transport of plastic materials, capture devices, vacuum systems for fugitive plastic, and/or equally effective BMPs only when any of the aforementioned are infeasible. *Id*. § XVIII.A.1.

88.     In lieu of the preferred treatment control and containment BMPs set forth in Section XVIII.A.1, a Facility may implement a suite of eight (8) BMPs listed in Permit Section XVIII.A.2.b.

89.     If a Facility opts to forego the preferred treatment systems set forth in XVIII.A.1, "[a]ny Plastic Materials that are discharged or that migrate off-site constitute

an illicit discharge in violation of this General Permit." *Id.* § XVIII.A.2.b.viii.

## V. FACTUAL BACKGROUND

### A. Facility Site Information, Industrial Activities, and Pollutant Sources.

90. California Secretary of State business records indicate the Facility has been operating in California since 1998, and the Facility, operating as Custom Blow Molding, has conducted industrial activities subject to IGP since at least 2011.

91. Pretium acquired Custom Blow Molding in 2016.

92. The 1.04-acre Pretium Facility first obtained IGP coverage to conduct industrial operations on March 2, 2020, under Waste Discharge Identification Number 9 37I028548.

93. As the 2015 Permit required all dischargers to register for NOI coverage by July 1, 2015, Pretium unlawfully operated the Facility, and discharged storm water, for almost five years without an NPDES Permit.

94. The Facility Standard Industrial Classification ("SIC") code is 3085 (Plastic Bottles).

95. Facilities with SIC codes 20XX through 39XX require IGP coverage. 2015 & 2020 Permits, Attachment A.

96. After receiving Plaintiffs' Notice Letter, Defendant updated its SWPPP in January 2022.

97. According to the 2022 SWPPP, the Pretium Facility "operates as a manufacturer of high-density polyethylene (HDPE) bottles which are used in packaging for the food and nutritional supplement industries." 2022 SWPPP § 3.2.

98. HDPE resin pellets are delivered to the site by truck and are conveyed pneumatically to two, stacked cargo container "silos" located in the eastern portion of the warehouse. Pellets are subsequently pneumatically conveyed to the resin pellet hoppers on twelve production lines. *Id.*

99. Pretium operates the facility year-round, five days per week (Monday through Friday), 24 hours per day in three shifts per day. *Id.*

100.   As acknowledged by the 2022 SWPPP, the Facility "is subject to NPDES sector-specific permitting requirements for Sector Y: Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Industries. These requirements include implementing BMPs for management of plastic pellets." *Id*. § 1.3.

101.   Potential pollutant sources at the Facility include, resin pellet delivery, shipping/receiving of resin pellets and chemical containers, manufacturing equipment, outdoor material storage, and waste containers including pallets, corrugated cardboard, and scrap plastics.

102.   The Facility's industrial activities and materials contribute a variety of pollutants to its storm water and non-storm water discharges. According to the Facility SWPPP, certain areas of industrial activity at the Facility are associated with specific storm water pollution threats. *Id*. § 4.

103.   According to the SWPPP, potential pollutant materials include resin pellets, motor fluids, manufacturing and janitorial chemicals, motor fluids, hydraulic oil, ethylene glycol, cardboard, scrap plastic bottles, packaging wastes, and office wastes. *Id*. § 4.1.

104.   Samples of the Facility's discharge obtained by CERF establish that the Facility frequently discharges high concentrations of metals such as copper, iron, lead, and zinc; nutrients such as nitrogen and phosphorus; and pH affecting substances in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment. Ex. 1, Sampling Data.

105.   City of Escondido ("City") inspection documentation and photos reveal multiple sources of metals, nutrients, and chemicals onsite. For example, large metal parts (some rusted) were observed during a March 2018 inspection. Ex. 1, p. 17.

106.   A July 2020 City inspection noted chemicals, including sodium and potassium sulfite, were stored onsite. *Id*. p. 18.

107.   City inspections conducted in December 2018, July 2020, and June 2021 found overflowing, uncovered trash bins with plastic, residue, and trash particles surrounding the trash bin. *Id*. p. 19-20.

108. On October 25, 2021, the Facility discharged plastic nurdles to the City's MS4 from Outfall 2. *Id*. p. 10-13.

109. According to the 2022 SWPPP, the Facility consists of two drainage areas. 2022 SWPPP § 3.3.

110. According to the 2022 SWPPP, Drainage Area DA-001 comprises the paved area on the northeast side of the building. DA-001 includes the shipping/receiving area, truck bay, employee parking, dumpster bay, and a portion of the roof. Stormwater that flows into the truck bay flows into a sump and is pumped to the paved area on the northeast side of the building. Runoff from the roof is collected via roof gutters and conveyed to the surface via downspouts. Runoff along the northeast side of the building flows along the concrete drainage swale to the driveway north of the building. *Id*.

111. Runoff from DA-001 discharges from the Facility at Outfall 001 and flows south along Andreasen Drive to an MS4 curb inlet roughly 150 feet from the driveway. *Id*.

112. According to the 2022 SWPPP, Drainage Area DA-002 comprises the paved area on the southeast side of the building. DA-002 includes the staging area, where Pretium temporarily stores resins, pallets, corrugated cardboard, and scrap plastic. Pretium also occasionally stores obsolete equipment in this area until it can be permanently removed. DA-002 also includes a portion of the building roof, two hard-topped spill pallets for new and used oils, and a fenced equipment area along the eastern exterior wall of the facility, including three air compressors (located under an awning), three air tanks, an aboveground oil separator, an air dryer, and three chillers. Runoff in this area flows along the concrete drainage swale to the south and continues along a small drainage channel on the southwest side of the facility. *Id*.

113. DA-002 discharges from the Facility at Outfall 002 via underground pipe to the curb inlet on Andreasen Drive. *Id*.

114. Plaintiffs are informed, believe, and thereon allege the Facility's retention capacity is modest compared to the Facility's impervious surface area, and that as such,

1   the Pretium Facility will discharge storm water during most QSEs.

2       115.   Storm water and non-storm water discharges from the Facility flow into the

3   City of Escondido MS4, which flow downstream to Escondido Creek, San Elijo Lagoon,

4   and eventually to the Pacific Ocean via the mouth of the lagoon at Cardiff State Beach.

5       116.   Plaintiffs are informed, believe, and thereon allege that industrial activities

6   occur, and industrial materials are handled, at various locations throughout the Pretium

7   Facility either outdoors without adequate cover to prevent storm water and non-storm

8   water exposure to pollutant sources, and/or without adequate secondary containment or

9   other adequate treatment measures to prevent polluted storm water and non-storm water

10  from discharging from the Facility.

11      117.   Plaintiffs are informed, believe, and thereon allege that many pollutants

12  associated with industrial activities occurring indoors or under partial shelter at the

13  Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or

14  otherwise, resulting in pollutant dispersal throughout the Facility.

15      118.   Plaintiffs are informed, believe, and thereon allege that pollutants associated

16  with the Facility's industrial activities have been and continue to be tracked by vehicles

17  and dispersed via wind throughout the entire site, and on and off the Facility through

18  ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and

19  aerial deposition of pollutants throughout the Facility as well as offsite.

20      119.   Plaintiffs are informed, believe, and thereon allege that one or more

21  regulated industrial activities are conducted at locations throughout the entire Facility,

22  and thus the entire Facility requires IGP coverage.

23      120.   Plaintiffs are informed, believe, and thereon allege that even if regulated

24  industrial activities are not conducted at all locations throughout the entire Facility,

25  BMPs or other controls do not adequately separate the storm water flows from portions of

26  the Facility where non-regulated activities may occur from storm water flows from the

27  regulated industrial activities.

28  /././

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES      17

121.   Plaintiffs are informed, believe, and thereon allege that, due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

122.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the Pretium Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

123.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

124.   Plaintiffs are informed, believe, and thereon allege that Defendant has discharged, and continues to discharge plastic nurdles in violation of the IGP and the Clean Water Act.

125.   Plaintiffs are informed, believe, and thereon allege that Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

126.   Plaintiffs are informed, believe, and thereon allege that the Pretium Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

127.   Plaintiffs are informed, believe, and thereon allege that elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

128.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Pretium Facility impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by

degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.      The Pretium Facility Discharges Contaminated Storm Water in Violation of the IGP.**

129.    Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Pretium Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

130.    Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

131.    Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharges from the Pretium Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the IGP.

**1.   Discharges of Polluted Storm Water from the Pretium Facility Violate IGP Discharge Prohibitions.**

132.    Plaintiffs are informed, believe, and thereon allege that the Pretium Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

133.    The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

134.    "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

135.    Storm water monitoring data collected by CERF demonstrates the Facility has discharged, and continues to discharge, concentrations of metals such as copper, iron, lead, and zinc; nutrients such as nitrogen and phosphorus; pH affecting substances; and

plastic nurdles in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. Ex. 1, Sampling Data.

136.   Plaintiffs are informed, believe, and thereon allege the Facility Owners and/or Operators have violated and continue to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

137.   Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

138.   "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

139.   Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

140.   Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Pretium Facility's discharges or to the downstream Receiving Waters.

141.   CERF's monitoring data of the Facility's discharge on October 25, 2021 shows numerous instances of concentrations of metals such as copper, iron, and zinc; nutrients such as nitrogen and phosphorus; and pH affecting substances in excess of respective Basin Plan Water Quality Objectives and the CTR. Ex. 1, Monitoring Data.

142.   Defendant's failures to collect storm water samples in accordance with the IGP and to analyze such samples for all required pollutants, do not excuse the Facility's violations of the Discharge Prohibitions provisions of the IGP.

143.   Each time the Pretium Facility discharges polluted storm water in violation

of Sections III.C or III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

144.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

145.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Discharge Prohibitions since December 7, 2016 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

## 2. Discharges of Polluted Storm Water from the Pretium Facility Violate IGP Effluent Limitations.

146.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

147.   Storm water monitoring data collected on October 25, 2021 indicates that the Facility's storm water discharges exceed the EPA benchmarks for zinc, copper, N+N, and pH. Ex. 1, Monitoring Data; 2021 MSGP Fact Sheet at 80–81.

148.   As exceedances of EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants, these exceedances indicate the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements.

149.   In addition, visual monitoring of Pretium Outfall 2 during the October 25, 2021 rain event showed discharges of plastic nurdles to the MS4, further establishing the inadequacy of the Facility's BMPs in violation of the Permit's BMP requirements. Ex. 1, p. 10-13.

150.   City inspections conducted between March 2018 and June 2021 found overflowing, uncovered trash bins with plastic, residue, and trash particles surrounding

the trash bin, as well as the outdoor, uncovered storage of large metal parts, some of which was rusted. These observations further indicate the Facility's BMPs fail to meet BAT/BCT requirements.

151. Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

152. These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

153. Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since December 7, 2016 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3. Discharges of Polluted Storm Water from the Pretium Facility Violate IGP Receiving Water Limitations.

154. Plaintiffs are informed, believe, and thereon allege that the Pretium Facility has violated and continues to violate IGP Receiving Water Limitations.

155. Storm water monitoring data collected by CERF on October 25, 2021 demonstrates the Facility has repeatedly discharged numerous pollutants in excess of various applicable WQS, thus violating the permit's Receiving Water Limitations.

156. The Receiving Waters are impaired for some of the same pollutants discharged by the Facility. As previously noted, Escondido Creek is impaired for phosphate, nitrogen, and toxicity, and is on the proposed 303(d) list for phosphorus and iron. San Elijo Lagoon also impaired for toxicity.

157. The October 25, 2021 monitoring data demonstrates the Facility has discharged iron, nitrogen, phosphorus, and pH in excess of respective Basin Plan Water Quality Objectives.

158. Storm water samples collected from the Facility on October 25, 2021 show

concentrations of N+N at 1.90 and 1.99 mg/L, far exceeding the Basin Plan Water Quality Objective of 1.0 mg/L. Similarly, the phosphorus concentrations were 0.37 and 0.59 mg/L, well in excess of the Water Quality Objective of 0.1 mg/L. Ex. 1, Monitoring Data.

159.    Excess concentrations of nutrients such as phosphorus and nitrogen can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins which move up the food chain, fish kills, and public health concerns. U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment *(last updated Mar. 1, 2021)*.

160.    The Facility's polluted discharges cause and/or contribute to Escondido Creek's phosphate, phosphorus, and nitrogen impairments.

161.    The October 25, 2021 monitoring results also show concentrations of iron at 0.877 mg/L, exceeding the Basin Plan Water Quality Objective of 0.3 mg/L for Escondido Creek. Ex. 1, Monitoring Data.

162.    The Facility's discharges of iron cause and/or contribute to Escondido Creek's iron impairment.

163.    The October 25, 2021 monitoring results show concentrations of zinc at 1.62 and 0.362 mg/L, far exceeding the CTR criteria of 0.12 mg/L. *Id*.

164.    The October 25, 2021 monitoring results show concentrations of copper at .047 mg/L, far exceeding the CTR criteria of .013 mg/L. *Id*.

165.    Copper and zinc are highly toxic pollutants in aquatic environments, and limitations on such toxic pollutants are specifically enumerated in the CTR. 40 C.F.R. § 131.38.

166.    The Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairments of Escondido Creek and San Elijo Lagoon.

167.    The Basin Plan and CTR are applicable WQSs under the IGP.

168.    Therefore, the Facility's frequent and ongoing storm water discharges

containing concentrations of multiple pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

169.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants from the Pretium Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation VI.B of the IGP.

170.   Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

171.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

172.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation since December 7, 2016 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**C.    Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

173.   Although Defendant has revised the Facility SWPPP in January 2022, after receipt of the Notice Letter, Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

174.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, commingling of process water with storm water, and the subsequent discharge of pollutants from the Facility, as required by the IGP.

175.   As described in Section V.B.2 *supra*, the Facility Owners and/or Operators have failed to identify and implement BMPs that would meet any of the aforementioned

1   objectives.

2       176.    Storm water monitoring data collected by CERF indicates that the Facility

3   discharges high concentrations of zinc, copper, iron, N+N, phosphorus, and pH in excess

4   of various benchmarks and applicable water quality standards, strongly indicating the

5   Facility's BMPs fail to meet IGP requirements. Ex. 1, Monitoring Data.

6       177.    The Facility's discharges of plastic nurdles further establish the inadequacy

7   of the Facility's BMPs in violation of the Permit's BMP requirements.

8       178.    City inspections identifying overflowing, uncovered trash bins with plastic,

9   residue, and trash particles surrounding the trash bin, as well as the outdoor, uncovered

10  storage of large metal parts, some of which were rusted, also indicate the Facility's BMPs

11  fail to meet IGP requirements.

12      179.    Plaintiffs are informed, believe, and thereon allege Defendant has failed and

13  continues to fail to develop and/or implement a SWPPP that includes an adequate

14  pollutant source assessment.

15      180.    The SWPPP fails to acknowledge the nutrients, metals, and pH affecting

16  substances in the Facility's discharge. According to the Facility 2022 SWPPP, of the

17  pollutants for which Escondido Creek is impaired, only TDS, nitrogen, and manganese

18  are found at the Facility. However, high concentrations of nitrogen, phosphorus, iron, and

19  toxic metals such as copper and zinc were found in the Facility's discharges.

20      181.    Documents obtained from the City of Escondido reveal multiple sources of

21  metals, nutrients, and chemicals onsite. For example, large metal parts (some rusted)

22  were observed during a March 2018 inspection. A July 2020 inspection noted chemicals,

23  including sodium and potassium sulfite, were stored onsite. Multiple inspections have

24  cited overflowing, uncovered trash bins with plastic, residue, and trash particles

25  surrounding the trash bin.

26      182.    Plaintiffs are informed, believe, and thereon allege that the Facility SWPPP

27  fails to adequately analyze the effectiveness of the Facility's existing BMPs in violation

28  of the IGP.

183.   Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the Pretium Facility is in part a result of Defendant's failure to develop, implement, and revise an adequate SWPPP.

184.   Plaintiffs are informed, believe, and thereon allege that Defendant's failure to adequately revise the Facility's SWPPP, and thus failure to improve the Facility's BMPs ensures that the Facility will continue to operate in violation of the IGP.

**D.   Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring Implementation Plan at the Pretium Facility.**

185.   Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

186.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement a MIP that ensures the collection of storm water samples from each drainage area and all discharge locations.

187.   Dischargers must collect samples "from each drainage area at all discharge locations." 2015 & 2020 Permits § XI.B.4.

188.    While Section XI.C.4 of the Permit allow permittees to reduce the number of locations to be sampled, there is no indication the Facility Owners and/or Operators have complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

189.   Thus, Defendant's failure to collect samples from both Outfall 1 and Outfall 2 violates the IGP.

190.   Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to collect the required number of storm water samples for each reporting period.

191.   While the Industrial General Permit requires Facilities to collect four samples each reporting period the Facility has never collected samples – whether operating as Custom Blow Molding or Pretium.

192.   Pretium's justifications for such failure are specious at best. Pretium has no justification for failing to enroll or monitor its discharges prior to 2020.

193.   For the 2019-2020 reporting year, Pretium claimed it was unable to sample because there were only significant rainfalls "on weekends during closed business hours."

194.   For the 2020-2021 reporting year, Pretium used the exact same excuse.

195.   Contrary to these claims, as reflected by the rainfall records, there were significant rain events characterized as QSEs during both reporting periods and those prior to Pretium's enrollment. *See* Ex. 1, Precipitation Data. Many of these rain events occurred between Monday and Friday.

196.   CERF also collected storm water samples from a QSE on October 25, 2021, while Defendant again failed to collect any samples.

197.   City inspection photographs also show discharges from the Facility at Outfall 1 and the adjacent driveway on December 7, 2018 when no samples were taken. This discharge constitutes either an unsampled QSE or an unlawful non-storm water discharge.

198.   Until it revised its SWPPP in January 2022, Pretium's scheduled operating hours were identified in its SWPPP as seven days per week, 24 hours per day in three shifts per day. Therefore, there was no significant rain event when the Facility was closed.

199.   Further, QSEs are required to be sampled within 4 hours of the start of scheduled facility operating hours if the QSE occurred in the previous 12 hours.

200.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the IGP. *See* 2015 & 2020 Permits §§ XI.B.6.c, d, e.

201.   As evidenced by the only sampling ever conducted for the Facility in its 10-plus year history of operations (CERF's October 25, 2021 sampling results) the Facility's industrial activities and materials contribute significant amounts of plastics, copper, nitrate/nitrite, phosphorus, iron, pH-affecting substances, and zinc to the Facility's storm

water discharges.

202. In addition, the Facility's discharges contain measurable quantities of Manganese, for which Escondido Creek is impaired.

203. However, Pretium's SWPPP requires sampling of only TSS, Oil and Grease, and pH.

204. Defendant's failure to analyze its own storm water discharges for all required parameters is particularly problematic as downstream Receiving Waters are impaired for some of these same pollutants (as further discussed in Section V.B.3, *supra*).

205. The IGP requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs.

206. Based on the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, and failure to collect the required number of storm water samples, Plaintiffs are informed, believe, and thereon allege, Defendant fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

**E.   Defendant Has Violated the IGP's Reporting Requirements.**

207. Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

208. Facility Owners and/or Operators have submitted multiple annual reports which were certified attesting to the Facility's compliance with the terms of the Industrial General Permit.

209. As discussed throughout Section V.B of this Complaint, the Facility has violated, and continues to violate, numerous provisions of the IGP.

210. The Facility's Legally Responsible Person ("LRP") knew or should have known the Facility failed to comply with numerous procedural and substantive provisions of the IGP, and thus certifications of these annual reports were erroneous.

211. Likewise, the LRP's justification for the Facility's failure to obtain samples during QSEs because significant rainfalls only occurred "on weekends during closed

business hours" is false in light of the Facility's 24-7 scheduled operating hours and numerous rain events during the relevant time period. *See* Ex. 1, Precipitation Data.

212.   Furthermore, precipitation data, direct observations, and City inspection records evidence that the LRP knew or should have known that numerous QSEs occurred during operating hours.

213.   Plaintiffs are informed, believe, and thereon allege the Facility's SWPPPs do not include many elements required by the IGP, and Defendant's certification to the contrary constitutes a violation of the IGP and CWA.

214.   Facility operators must report any noncompliance with the IGP at the time that the Annual Report is submitted, including (1) a description of the noncompliance and its cause, (2) the period of noncompliance, (3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to reduce and prevent recurrence of the noncompliance. 2015 & 2020 Permits § XVI.B.2.

215.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed to report numerous instances of non-compliance required by the IGP.

## F.   Defendant Has Violated the IGP's Plastic Materials Special Requirements.

216.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to comply with the IGP's Plastic Materials requirements.

217.   As the 2022 SWPPP admits, the "facility operates under the Standard Industrial Classification (SIC) code 3085: Plastic Bottles and is therefore subject to the stormwater permitting requirements under 40 CFR 122.26, subpart 14(xi), which are addressed through the California State Water Board Water Quality Order No. 2014-0057-DWQ NPDES General Permit (the Industrial General Permit or IGP)." 2022 SWPPP § 1.3.

218.   In lieu of the preferred treatment control BMPs, Pretium selected alternative BMPs listed in Permit Section XVIII.A.2.b. to prevent the discharge of plastic pollutants to stormwater pathways. *Id*. § 5.3

219.   However, Pretium has neither implemented its BMPs nor shown that its BMPs are effective at preventing the discharge of Plastic Materials.

220.   As discussed thoroughly *supra*, nurdles were found in the Facility's storm water discharge. Plastic Materials were documented near the Facility's trash cans during City of Escondido inspections.

221.   The Facility has never sampled any QSEs and likely never conducted visual observations during rain events. CERF volunteers did not see any Pretium employees conducting visual observations during the October 25, 2021 QSE despite the presence of nurdles in the Facility's storm water discharge.

222.   Therefore, the Facility's "Advanced Plastic Facility BMPs" do not equate to or exceed the performance requirements of a containment system.

223.   The Facility has also failed to establish that the containment system is infeasible pursuant to 2015 & 2020 Permits § XVIII.A.1.b. Two of the Facility's discharge points (Outfalls 1 and 2) could readily be outfitted with containment systems designed to trap articles retained by a 1mm mesh screen.

224.   In light of the foregoing, the Facility fails to meet multiple provisions of the IGP's Plastic Materials requirements.

**V.      CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

225.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

226.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

227.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

228.   Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of the IGP Discharge Prohibition at the Facility every day from December 7, 2016 to the present. Plaintiffs are informed and believe, and thereon allege that Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

229.   Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 7, 2016 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

230.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

231.   Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

232.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

233.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of

the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

234.   Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

235.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from December 7, 2016 to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

236.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

237.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since December 7, 2016. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

238.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

239.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

240.   Plaintiffs are informed and believe, and thereon allege, that Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

241.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

242.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

243.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 2015 & 2020 Permits §§ VI.A–B; 33 U.S.C. § 1311(b).

244.   Plaintiffs are informed, believe, and thereon allege Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

245.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from December 7, 2016 to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

246.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

247.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct

violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

248.    Plaintiffs are informed, believe, and thereon allege Defendant has been in violation of the IGP Receiving Water Limitations every day since December 7, 2016. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since December 7, 2016. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

249.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

250.    Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

251.    Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

252.    Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

253.    Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from December 7, 2016, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

254.    Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

/././

255.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since December 7, 2016. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

256.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

257.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

258.   Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

259.   Defendant has been in violation of the IGP MIP requirements every day from December 7, 2016, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

260.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

261.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since December 7, 2016. 33 U.S.C. §§ 1319(d), 1365,

and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

### Failure to Report as Required in Violation of the IGP and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

262.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

263.   Plaintiffs are informed and believe, and thereon allege Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

264.   The Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XVI; *see also* 33 U.S.C. § 1311(b).

265.   Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least December 7, 2016. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

266.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

267.   Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since December 7, 2016. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

268.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

269.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

270.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to collect and analyze the required number of storm water samples the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

271.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

272.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to collect storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP and CWA. *See* 2015 & 2020 Permits § XI.B.4; *see also* 33 U.S.C. § 1311(b).

273.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since December 7, 2016. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

274.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

275.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since December 7, 2016. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

/././

**EIGHTH CAUSE OF ACTION**

**Failure to Comply with Plastic Materials Special Requirements of the IGP.
33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

276.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

277.   Plaintiffs are informed and believe, and thereon allege, that the Facility handles Plastic Materials as defined by the IGP, and Defendant is therefore subject to the Plastic Materials Special Requirements of the IGP. *See* 2015 & 2020 Permits § XVIII.

278.   Plaintiffs are informed and believe, and thereon allege that lieu of the preferred treatment control BMPs enumerated in Section XVIII.A of the IGP, Defendant opted to implement the suite of eight BMPs set forth in Section XVIII.A.2.b.

279.   Plaintiffs are informed and believe, and thereon allege that Defendant failed to comply with the requirements of either Section XVIII.A or XVIII.A.2.b in violation of the IGP.

280.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to comply with the IGP's Plastic Materials requirements at the Facility since December 7, 2016. Defendant's violations of the Plastic Materials requirements and the Clean Water Act are ongoing and continuous.

281.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's Plastic Materials requirements.

282.   Each and every violation of the IGP's Plastic Materials requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since December 7, 2016. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

**VI.   RELIEF REQUESTED**

283.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant to have violated and to be in violation

of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.     A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.     A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.     A court order assessing civil monetary penalties for each violation of the CWA at $56,460.00 per day per violation for violations that occurred after November 2, 2015 and assessed on or after December 23, 2020, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

e.     A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.     Any other relief as this Court may deem appropriate.

Dated: February 8, 2022

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org