

December 7, 2021

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Pretium Packaging LLC                     Corporation Service Company
ATTN: Managing Agent                  Agent for Service of Process
946 S Andreasen Drive                    Pretium Packaging LLC
Escondido CA 92029                       2710 Gateway Oaks Drive, Suite 150N
                                                      Sacramento, CA 95833

**Re:     Notice of Violation and Intent to File Suit Under the Clean Water Act**

To the Above-Listed Recipients:

Please accept this letter on behalf of Coastal Environmental Rights Foundation ("CERF") and San Diego Coastkeeper ("Coastkeeper") regarding violations of the Clean Water Act[1] and California's General Permit for Storm Water Discharges Associated with Industrial Activities[2] ("Industrial General Permit"), occurring at the Pretium Packaging LLC facility at 946 S. Andreasen Drive, Escondido, CA 92029 ("Facility" or "Pretium Facility"). The purpose of this letter is to put Pretium Packaging LLC ("Pretium"), as the owner and/or operator of the Facility, on notice of the violations of the Industrial General Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Industrial General Permit are violations of the Clean Water Act. As explained below, Pretium is liable for violations of the Industrial General Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action, a citizen must give notice of their intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation.[3] This notice letter ("Notice Letter") is being sent to you as the responsible Owners and/or Operators of the Facility or as the registered agent for the Owners and/or Operators. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform the Facility Owners and/or Operators that CERF and Coastkeeper intend to file a federal enforcement action against Pretium for violations of the Industrial General Permit and the Clean Water Act sixty (60) days from the date of this Notice Letter.

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), and Order No. 2014-0057-DWQ ("2015 Permit") as amended in 2015 and 2018.
[3] *See* 40 C.F.R. § 135.2(a)(1).

## 1.   BACKGROUND

### 1.1.   <u>Coastal Environmental Rights Foundation and San Diego Coastkeeper</u>

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, California. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. CERF's mailing address is 1140 S. Coast Highway 101, Encinitas, California 92024. Its phone number is 760-942-8505.

San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3900 Cleveland Avenue, Suite 102, San Diego, California 92103. Its telephone number is 619-758-7743. Founded in 1995, San Diego Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of San Diego County watersheds. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of themselves and their members.

Members of Coastkeeper and CERF live, work, recreate, and/or otherwise use and enjoy the areas in and around the waters into which the Facility discharges, including Escondido Creek, San Elijo Lagoon, and the Pacific Ocean (collectively "Receiving Waters"). Members of Coastkeeper and CERF use the Receiving Waters to swim, boat, kayak, surf, bird watch, view wildlife, fish, hike, bike, walk, run, general aesthetic enjoyment, and/or for educational opportunities or developing educational tools. Additionally, members of Coastkeeper and CERF use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The discharges of pollutants from the Facility impair each of these uses. Discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's and CERF's members have been, are being, and will continue to be adversely affected by the Facility Owners and/or Operators' failure to comply with the Clean Water Act and the Industrial General Permit.

### 1.2.   <u>The Owners and/or Operators of the Facility</u>.

Information available to Coastkeeper and CERF indicates that Pretium has owned and/or operated the Pretium Facility located at 946 S. Andreasen Dr., Escondido, CA 92029 for at least the past five years.[4] Certain classified facilities that discharge storm water associated with industrial activity are required to submit a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Industrial General Permit coverage.[5] Information available to Coastkeeper and CERF indicates the Facility first obtained Industrial General Permit coverage on March 2, 2020. The Facility submitted an NOI on February 19, 2020, which is publicly available via the Storm Water Multiple Application & Reporting Tracking System

---

[4] Pretium Packaging Announces the Acquisition of Custom Blow Molding, July 22, 2016, available at https://www.prnewswire.com/news-releases/pretium-packaging-announces-the-acquisition-of-custom-blow-molding-300302864.html
[5] *See* 2015 and 2020 Permits, Attachment A.

("SMARTS") database. The NOI lists "Pretium Packaging" as the Facility's operator. Jorge Chao is also listed as the Legally Responsible Person on the Facility's most recent Storm Water Pollution Prevention Plan ("SWPPP"), which was uploaded to SMARTS on February 10, 2020.

The Owners and/or Operators have violated and continue to violate the procedural and substantive terms of the Industrial General Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein, the Facility Owners and/or Operators are liable for violations of the Industrial General Permit and the Clean Water Act.

### 1.3. Industrial General Permit Coverage.

Pretium conducts industrial activities that are subject to the Industrial General Permit. The Facility's NOI lists the Facility's Standard Industrial Classification ("SIC") code as 3085 (Plastic Bottles). This SIC codes require Industrial General Permit coverage. 2015 & 2020 Permits, Attachment A.

The 2015 Permit required all dischargers to register for NOI coverage by July 1, 2015. While the California Secretary of State business records indicate the Facility has been operating in California since 1998, the Owners and/or Operators failed to enroll the Facility under the Industrial General Permit by July 1, 2015. Operating as Custom Blow Molding, the Facility was conducting industrial activities subject to Permit coverage since at least 2011. Though Pretium acquired Custom Blow Molding in 2016, it did not obtain Industrial Permit Coverage until March 2020. For at least four years (as Pretium), the Facility operated unlawfully without an NPDES Permit.

The Facility's Waste Discharge Identification ("WDID") number is 9 37I028548. According to the Facility's NOI, the Facility is 1.04 acres, all of which are industrial area exposed to storm water, and 78 percent of the Facility is impervious.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that industrial activities are conducted throughout the Facility, and thus the entire Facility requires Industrial General Permit coverage. In addition, the Industrial General Permit's definition of "storm water associated with industrial activities," as well as the Permit's explanation of material handling activities, requires Permit coverage for all storm water from non-industrial sources that comingles with industrial storm water. Because the Facility lacks best management practices ("BMPs") or other controls to separate industrial storm water flows from portions of the Facility where non-regulated activities may occur, industrial storm water at the Facility comingles with potential non-storm water, and thus all storm water discharges from the Facility require coverage under the Industrial General Permit.

### 1.4. Storm Water Pollution and the Receiving Waters.

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations around San Diego County, such as the Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface

waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from Facility contain excessive concentrations of metals such as copper, iron, lead, and zinc; nutrients such as nitrogen and phosphorus; and pH affecting substances. Visual observations confirm discharge of resin pellets as well. According to the SWPPP, storm water from the Facility discharges at two outfalls from two drainage areas: Outfall 1 and Outfall 2.[6] However, CERF and Coastkeeper volunteers observed industrial storm water discharging in an additional location, at the driveway adjacent to Outfall 1. This discharge is neither referenced in the SWPPP, nor reflected on the Site Map.

Storm water discharges from the Facility at Outfall 1 and Outfall 2 and the northern-most driveway enter the City of Escondido municipal separate storm sewer system ("MS4"), and thereafter flow to Escondido Creek, San Elijo Lagoon, and ultimately the Pacific Ocean.[7] Discharges of polluted storm water pose threats to public health and adversely affect the aquatic environment and surrounding ecosystems.

Polluted discharges from the Facility harm the ecological significance of Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. The Receiving Waters into which the Facility discharges polluted storm water are ecologically sensitive areas.

Polluted discharges from the Facility also harm the special aesthetic and recreational significance of the Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. Trails and observation points along Escondido Creek and San Elijo Lagoon are frequently used for jogging, hiking, birdwatching, photography, general aesthetic enjoyment, scientific study, and data collection, among other things. Just downstream from the Facility, Escondido Creek runs through Harmony Grove and the Elfin Forest Recreational Reserve, a popular hiking destination. Surfing is also popular at the mouth of San Elijo Lagoon at Cardiff State Beach.

Pollutants discharged from the Facility can affect the health of the Receiving Waters, and thus the plant and animal life of the surrounding habitats. Damage to these natural habitats, and thus the flora and fauna within them, harms the ability of the public, including Coastkeeper's and CERF's members' ability, to use and enjoy these unique recreational and scientific opportunities. Such pollution can also negatively impact human health. Further, Coastkeeper's and CERF's members are less likely to recreate in and around such waters that are known to be polluted with harmful metals, plastic materials, excessive nutrients, and other pollutants.

The *Water Quality Control Plan for the San Diego Basin* ("San Diego Basin Plan" or "Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for Escondido Creek include municipal and domestic water supply; contact water recreation; non-contact recreation; warm and cold freshwater habitat; hydropower generation; wildlife

---

[6] SWPPP, p. 10.
[7] Id.

habitat; and agricultural supply.[8] The Beneficial Uses for San Elijo Lagoon include contact water recreation; non-contact recreation; preservation of biological habitats of special significance; estuarine habitat; wildlife habitat; rare, threatened, or endangered species; marine habitat; migration of aquatic organisms; and spawning, reproduction, and/or early development.[9] The Beneficial Uses for the Pacific Ocean include industrial service supply; navigation; contact water recreation; non-contact water recreation, commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aquaculture; and rare, threatened, or endangered species.[10]

According to the current 303(d) List of Impaired Water Bodies, Escondido Creek is impaired for benthic community effects, bifenthrin, DDT, indicator bacteria, manganese, nitrogen, phosphate, selenium, sulfates, Total Dissolved Solids (TDS), and toxicity. The proposed listings[11] for Escondido Creek (for the 2020-2022 integrated report) are cyfluthrin, cypermethrin, iron, phosphorus, pyrethroids, and turbidity.

San Elijo Lagoon is impaired for indicator bacteria, toxicity, sedimentation/siltation, and eutrophic impacts.[12] San Elijo Lagoon proposed listings include dissolved oxygen and turbidity. The Pacific Ocean shoreline at San Elijo Lagoon has a proposed listing for indicator bacteria. Polluted discharges from industrial sites such as the Facility contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

## 2.   THE FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1.   <u>The Facility Site Description and Industrial Activities</u>.

According to its SWPPP, the Pretium Facility operates as a manufacturer of high-density polyethylene (HDPE) bottles which are used in packaging for the food and nutritional supplement industries.[13] Potential pollutant sources at the Facility include, resin pellet delivery, shipping/receiving of resin pellets and chemical containers, manufacturing equipment, outdoor material storage, and waste containers including pallets, corrugated cardboard, and scrap plastics.

### 2.2.   <u>Pollutants and Pollutant Sources Related to the Facility's Industrial Activities</u>.

The Facility's industrial activities and material contribute a variety of pollutants to its storm water and non-storm water discharges. Samples of the Facility discharge obtained by CERF establish that the Facility frequently discharges high concentrations metals such as copper, iron, lead, and zinc; nutrients such as nitrogen and phosphorus; and pH affecting substances in

---

[8] Basin Plan, Table 2-2.
[9] *Id*., Table 2-3.
[10] *Id*.
[11]

https://gispublic.waterboards.ca.gov/portal/apps/webappviewer/index.html?id=32f238f9c3d642238e0b3a20262d1c17
[12] 2016 Integrated Report – All Assessed Waters, *available at* *https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml*.
[13] SWPPP, p. 6.

excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment.[14]

According to the Facility SWPPP, certain areas of industrial activity at the Facility are associated with specific storm water pollution threats.[15] Potential pollutant materials include, resin pellets, motor fluids, manufacturing and janitorial chemicals, motor fluids, hydraulic oil, ethylene glycol, cardboard, scrap plastic bottles, packaging wastes, and office wastes.[16]

As noted in Sections 3.4 and 3.5, *infra*, the Facility SWPPP has failed and continues to fail to include an adequate description of potential pollutant sources, an adequate pollutant source assessment, and the Owners and/or Operators have failed and continue to fail to monitor for all pollutants as required by the Permit.

Information available to Coastkeeper and CERF indicates that many of the aforementioned industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility. Further, many pollutants associated with industrial activities occurring indoors or under partial shelter regularly escape via wind dispersion, track out, or otherwise, resulting in pollutant dispersal throughout the Facility. Information available to Coastkeeper and CERF indicates the pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles, foot traffic, and dispersed via wind and storm water throughout the entire site, and on and off the Facility through ingress and egress. This results in employees, customer, and vehicles tracking metal particles, nutrients, sediment, O&G, and other pollutants off-site. The resulting illegal discharges of polluted storm water and non-storm water impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human wellbeing, aquatic life, and ecosystem health.

## 3.   VIOLATIONS OF THE CLEAN WATER ACT AND THE INDUSTRIAL GENERAL PERMIT

In California, any person who discharges storm water associated with certain industrial activity must comply with the terms of the Industrial General Permit in order to lawfully discharge pollutants.[17]

On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Industrial General Permit was reissued ("2015 Permit"). On July 1, 2020, pursuant to Order 2014-0057-DWQ as amended in 2015 and 2018 ("2020 Permit"), the reissued 2020 Industrial General Permit took effect. As explained below, the 2020 Permit includes terms that are as stringent or more stringent than the 2015 Permit. Accordingly, the Facility Owners and/or Operators are liable for violations of the

---

[14] Ex. 1, Facility's storm water sampling data.
[15] SWPPP, p. 14.
[16] Id.
[17] *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

2015 Permit and ongoing violations of the 2020 Permit, and civil penalties and injunctive relief are available remedies.[18]

### 3.1. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Discharge Prohibitions.</u>

The Industrial General Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit."[19] The Discharge Prohibitions provisions prohibit the direct or indirect discharge of liquids or materials other than storm water non-storm water discharges ("NSWDs"), which are not otherwise authorized by a NPDES permit, to the waters of the United States.[20] "Measures to control sources of unauthorized NSWDs such as spills, leakage, and dumping, must be addressed through the implementation of Best Management Practices (BMPs)."[21]

These provisions further prohibit storm water discharges and authorized NSWDs which cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code.[22] The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease." "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

Information available to Coastkeeper and CERF indicates the Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters. For example, the Facility's own storm water monitoring data demonstrates the Facility has discharged, and continues to discharge, concentrations of metals such as copper, iron, lead, and zinc; nutrients such as nitrogen and phosphorus; and pH affecting substances in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters.[23] Such discharges of polluted storm water violate the Industrial General Permit.[24]

Section III.D of the 2015 and 2020 Permits states that "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control

---

[18] *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480–81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853–54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121–22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

[19] 2015 & 2020 Permits § III.A.

[20] 2015 & 2020 Permits § III.B.

[21] 2015 & 2020 Permit § I.C.28.

[22] 2015 & 2020 Permits § III.C.

[23] *See* Ex. 1.

[24] *See* 2015 & 2020 Permits § III.C.

Plans (Basin Plans), or statewide water quality control plans and policies are prohibited." The San Diego Basin Plan designates beneficial uses for water bodies in the San Diego region and establishes water quality objectives and implementation plans to protect those beneficial uses.[25] The Basin Plan further establishes certain Waste Discharge Prohibitions.[26] Waste Discharge Prohibition number 5 of the Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board."[27] "Waste" is defined as "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water.[28] Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

Information available to Coastkeeper and CERF indicates that no express allowance for dilution has been granted by the Regional Board applicable to the Facility's discharges or to the downstream Receiving Waters. As such, and consistent with Coastkeeper and CERF's review of available information, the analytical results of storm water sampling at the Facility demonstrate that the Facility Owners and/or Operators have violated and continue to violate Discharge Prohibition III.D of the 2015 and 2020 Permits by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the California Toxics Rule ("CTR").[29] For example, the CERF's monitoring data of the Facility's discharge on October 25, 2021 shows numerous instances of concentrations of metals such as copper, iron, and zinc; nutrients such as nitrogen and phosphorus; and pH affecting substances in excess of respective Basin Plan Water Quality Objectives and the CTR.[30] Thus, the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the Industrial General Permit Discharge Prohibitions are violated each time storm water discharges from the Facility.[31] These Discharge Prohibition violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 and 2020 Permits. Each time the Facility

---

[25] *See* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/ for updated Basin Plan.

[26] San Diego Basin Plan, Chapter 4, page 4-19.

[27] *Id*. at page 4-20 (Waste Discharge Prohibition 5).

[28] California Water Code, § 13050(d).

[29] 40 C.F.R. § 131.38.

[30] Ex. 1.

[31] *See* Exhibit 2, which includes the dates of all precipitation events above .1 inches recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 2 was recorded by the National Oceanic & Atmospheric Administration at the three weather monitoring station geographically nearest to the Facility with complete precipitation records. Coastkeeper and CERF will include additional dates of rain events when that information becomes available. Data Codes: DAPR - Number of days included in the multiday precipitation total (MDPR); PRCP – Precipitation; MDPR - Multiday precipitation total (use with DAPR and DWPR, if available).

Owners and/or Operators discharge polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 and 2020 Permits is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in violation since December 7, 2015, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owners and/or Operator are subject to civil penalties for all violations of the Clean Water Act occurring since that time.

Further, Coastkeeper and CERF put the Facility Owners and/or Operators on notice that Discharge Prohibitions III.B, III.C, and III.D are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with the Discharge Prohibition provisions.

### 3.2. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Effluent Limitations</u>.

The Industrial General Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[32]

The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation V.A of the 2015 and 2020 Permits.[33] As such, discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[34]

Information available to Coastkeeper and CERF indicates that BMPs that would achieve BAT/BCT have not been developed and/or implemented at the Free Builders Facility. The Facility's own storm water monitoring data indicates that the Facility's storm water discharges exceed the EPA benchmarks for zinc, copper, N+N, and pH. For example, on October 25, 2021, the Facility discharged concentrations of zinc at .362 mg/L exceeding the benchmark of 0.12 mg/L. Both outfalls exceeded the nitrate/nitrite benchmark and water quality objective as well.[35]

---

[32] 2015 & 2020 Permits § V.A.
[33] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009, Fact Sheet at 106; *see also* 65 Fed. Reg. 64839 (2000).
[34] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).
[35] See Exhibit 1, table of exceedances; Exhibit 3, Monitoring Report for 10/25/2021 sampling event

*Pretium Packaging*
December 7, 2021
Page 10

      Thus, sampling data collected indicates the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements. In addition, visual monitoring of Pretium Outfall 2 during the October 25, 2021 rain event showed discharge of resin pellets (nurdles) to the MS4.





*Pretium Packaging*
December 7, 2021
Page 12





Notably, the October 25, 2021 samples obtained by CERF did not capture a nurdle in the sampling bottles. Therefore, the data does not reflect the Facility's blatant discharge of plastics to the MS4.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the Industrial General Permit Effluent Limitations are violated each time storm water discharges from the Facility.[36] These violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each time the Facility Owners and/or Operators discharge polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in violation since May 21, 2015, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since December 7, 2015.

Further, Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the 2015 and 2020 Permit Effluent Limitation V.A is an independent requirement that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs

---

[36] *See* Ex.2.

listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with Effluent Limitation V.A.

### 3.3. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Receiving Water Limitations.</u>

The Receiving Water Limitations of the 2015 and 2020 Permits prohibit storm water discharges and authorized NSWDs that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[37] The Basin Plan designates Beneficial Uses for the Receiving Waters. WQS are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above WQS contribute to the impairment of Receiving Waters' Beneficial Uses. Applicable WQS include, among others, the CTR standards and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable basin plan.[38] The CTR and Basin Plan are applicable WQSs under the Industrial General Permit. Discharges that contain pollutants in excess of an applicable WQS violate the Industrial General Permit Receiving Water Limitations.

Receiving Water Limitation VI.B of the 2015 and 2020 Permits prohibits storm water discharges and authorized NSWDs to surface water that adversely impact human health or the environment. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Industrial General Permit Receiving Water Limitation.[39]

Storm water monitoring data collected by CERF demonstrates the Facility has repeatedly discharged numerous pollutants in excess of various applicable WQS, thus violating the permit's Receiving Water Limitations. This data demonstrates the Facility has discharged iron, nitrogen, phosphorus, and pH in excess of respective Basin Plan Water Quality Objectives.[40] The data also demonstrates the Facility has discharged storm water with concentrations of zinc and copper in excess of their respective CTR standards.[41]

As explained *supra*, the Receiving Waters are impaired, and thus unable to support designated Beneficial Uses, for some of the same pollutants discharged by the Facility. Escondido Creek is impaired for phosphate and nitrogen and is on the proposed 303(d) list for phosphorus and iron. Storm water samples collected from the Facility on October 25, 2021 show concentrations of nitrate/nitrate at 1.90 and 1.99 mg/L, far exceeding the Basin Plan Water Quality Objective of 1.0 mg/L. Similarly, the phosphorus concentrations were .37 and .59 mg/L, well in excess of the Water Quality Objective of 0.1 mg/L.

Excess concentrations of nutrients such as phosphorus and nitrogen can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such toxins

---

[37] 2015 & 2020 Permits § VI.A.
[38] *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–67 (9th Cir. 1999).
[39] 2015 & 2020 Permits § VI.B.
[40] *See* Ex. 1; Ex. 3.
[41] *Id.*

can move up the food chain.[42] High nitrogen and phosphorus loadings also result in reduced spawning grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking water sources and increased exposure to toxic microbes.[43] As such, the Facility's polluted discharges cause and/or contribute to Escondido Creek's phosphate, phosphorus, and nitrogen impairments.

Escondido Creek and San Elijo Lagoon are also impaired for toxicity. Copper and zinc are highly toxic pollutants in aquatic environments, and limitations on such toxic pollutants are specifically enumerated in the CTR. 40 C.F.R. § 131.38. The Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairments of Escondido Creek and San Elijo Lagoon.

The Basin Plan and CTR are applicable WQSs under the Industrial General Permit. Therefore, the Facility's frequent and ongoing storm water discharges containing concentrations of multiple pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the Industrial General Permit.[44]

Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Industrial General Permit Receiving Water Limitations.[45]

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that Industrial General Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility.[46] Each time discharges of storm water from the Facility cause and/or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation VI.A of the 2015 and 2020 Permits, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation VI.B of the 2015 and 2020 Permits, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Industrial General Permit Receiving Water Limitations. The Facility Owners and/or Operators have been in violation since at least December 7, 2015, and Coastkeeper and CERF will update the dates of violation when additional information and data becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since that time.

Further, Coastkeeper and CERF put Pretium on notice that Receiving Water Limitations are independent Industrial General Permit requirements that must be complied with, and that

---

[42] U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment *(last updated Apr. 15, 2019)*.

[43] U.S. EPA, *Memorandum, Nutrient Pollution and Numeric Water Quality Standards* (May 5, 2007) https://www.epa.gov/sites/production/files/2014-08/documents/nutrient-memo-may252007.pdf

[44] 2015 & 2020 Permits § VI.A.

[45] *See* 2015 & 2020 Permits § VI.B.

[46] *See* Exs. 1, 2.

carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with the Receiving Water Limitations.

### 3.4. <u>Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan</u>.

The Industrial General Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan prior to conducting industrial activities.[47] The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities.[48] A permittee has an ongoing obligation to revise the SWPPP as necessary to ensure compliance with the Industrial General Permit.

The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan ("MIP").[49]

Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the Industrial General Permit.[50] The 2015 and 2020 Permits require dischargers to certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revisions.[51] Dischargers are also required to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP.[52]

Pretium has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, the commingling

---

[47] 2015 & 2020 Permits §§ X.A–B.
[48] 2015 & 2020 Permits § X.C.
[49] 2015 & 2020 Permits §§ X.A–I.
[50] 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1.
[51] 2015 & 2020 Permits § X.B.2.
[52] 2015 & 2020 Permits §§ X.B, XV.

of non-storm water with storm water, and the subsequent discharge of pollutants from the Facility, in violation of the Industrial General Permit.

The Facility SWPPP's pollutant source assessment fails to adequately describe all industrial activities and materials, potential pollutant sources, and areas of industrial activity in violation of the Industrial General Permit. Most notably, the SWPPP fails to acknowledge the nutrients, metals, and pH affecting substances in the Facility's discharge.[53] According to the Facility SWPPP, none of the pollutants for which Escondido Creek is impaired are found at the Facility. Nonetheless, high concentrations of nitrogen, phosphorus, and iron are found in the Facility's discharge. Documents obtained from the City of Escondido reveal multiple sources of metals, nutrients, and chemicals onsite. For example, large metal parts (some rusted) were observed during a March 2018 inspection.



During a July 2020 inspection, the City noted chemicals, including sodium and potassium sulfite, were stored onsite.

---

[53] See, Ex. 1.

*Pretium Packaging*
December 7, 2021
Page 18



In December 2018 and more recently in July 2020 and June 2021, the City noted overflowing, uncovered trash bins with plastic, residue, and trash particles surrounding the trash bin. Thus, the Facility has not only failed to adequately assess its pollutant sources, but also failed to implement adequate BMPs.

*Pretium Packaging*
December 7, 2021
Page 19



Dec 7, 2018 at 10:36 AM



Jul 2, 2020 at 11:13 AM

*Pretium Packaging*
December 7, 2021
Page 20



Jun 16, 2021 at 8:03 AM

    The Facility Owners and/or Operators have also failed to revise the Facility's SWPPP to ensure compliance with the Industrial General Permit. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision.[54] Despite the significant concentrations of pollutants in the Facility's storm water discharges each year, information available to Coastkeeper and CERF indicates the Facility SWPPP has remained the same since its initial upload and has not been revised to include additional BMPs to eliminate or reduce these pollutants, as required by the Permit.

    The Facility site map remains defective, failing to acknowledge the industrial discharge at the northern-most driveway adjacent to Outfall 1.

    Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise the Facility SWPPP in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit SWPPP requirements since at least December 7, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility

---

[54] 2015 & 2020 Permits, § X.B.

Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.5. <u>Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program</u>.

The Industrial General Permit requires permittees to develop and implement a storm water MIP prior to conducting industrial activities.[55] The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the Industrial General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.[56] The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges.[57]

Sections XI.B.1–5 of the 2015 and 2020 Permits require permittees to collect storm water discharge samples from a qualifying storm event ("QSE")[58] as follows: (1) from each drainage area at all discharge locations, (2) from two (2) storm events within the first half of each Reporting Year[59] (July 1 to December 31), (3) from two (2) storm events within the second half of each Reporting Year (January 1 to June 30), and (4) within four hours of the start of a discharge, or the start of Facility operations if the qualifying storm event occurs within the previous 12-hour period. The Industrial General Permit requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized NSWDs.[60]

Sections XI.B.6.a–b of the 2015 and 2020 Permits require permittees to analyze samples for TSS, O&G, and pH. Section XI.B.6.c–d of the 2015 and 2020 Permits require permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, Facility Owners and/or Operators are required to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. Section XI.B.6.e of the 2015 and 2020 Permits also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

The Facility Owners and/or Operators have conducted and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP. The Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Industrial General Permit. Information available to Coastkeeper and CERF indicates the Facility's industrial activities and materials contribute significant amounts of plastics, copper, nitrate/nitrite, phosphorus, iron, pH-affecting substances,

---

[55] 2015 & 2020 Permits, §§ X.I, XI.

[56] 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

[57] 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

[58] A qualifying storm event is defined as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 & 2020 Permits § XI.B.1.

[59] A Reporting Year replaced the 1997 permit term Wet Season, and is defined as July 1 through June 30. 2015 Permit, Findings, ¶ 62(b).

[60] 2015 & 2020 Permits § XI.A.1.

and zinc to the Facility's storm water discharges. This is evidenced by the only sampling ever conducted for the Facility in its 10-plus year history of operations, CERF's October 25, 2021 monitoring.[61] However, the Facility has failed to analyze its own storm water discharges for these parameters. This is particularly problematic as downstream Receiving Waters are impaired for some of these same pollutants (phosphorus, phosphate, and nitrogen). In addition, the Facility's discharge contains measurable quantities of Manganese, for which Escondido Creek is impaired. However, Pretium's SWPPP requires sampling of only TSS, Oil and Grease, and pH.

The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a MIP that requires the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of Industrial General Permit.[62] While Section XI.C.4 of the Permit allow permittees to reduce the number of locations to be sampled, there is no indication the Facility Owners and/or Operators have complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility. As such, the Facility's failure to collect samples from the driveway adjacent to Outfall 1 violates the Industrial General Permit.

The Facility Owners and/or Operators have failed and continue to fail to collect the required number of storm water samples for each reporting period. The Industrial General Permit requires Facilities to collect four samples each reporting period. However, the Facility has never collected samples – whether operating as Custom Blow Molding or Pretium. Pretium's justifications for such failure are specious at best. Pretium has no justification for failing to enroll or monitor its discharges prior to 2020. For the 2019-2020 reporting year, Pretium claimed it was unable to sample because there was only significant rainfalls "on weekends during closed business hours." For the 2020-2021 reporting year, Pretium used the exact same excuse. However, as reflected by the rainfall records, there were significant rain events characterized as QSEs during both reporting periods and those prior to Pretium's enrollment.[63] City of Escondido inspection photographs also show discharges from the Facility at Outfall 1 and the adjacent driveway on December 7, 2018 when no samples were taken. This discharge constitutes either an unsampled QSE or an unlawful non-storm water discharge.

---

[61] See, Ex. 1, Ex. 3.
[62] *See* 2015 & 2020 Permits § XI.B.4.
[63] *See*, Ex. 2.



Dec 7, 2018 at 11:56 AM

Moreover, Pretium's scheduled operation hours are 7 days per week, 24 hours per day in three shifts per day.[64] Therefore, there was no significant rain event when the Facility was closed. Further, QSEs are required to be sampled within 4 hours of the start of scheduled facility operating hours if the QSE occurred in the previous 12 hours.[65]

The Facility's SWPPP, site map, MIP, and annual reports fail to adequately explain why the Facility failed to collect four samples each reporting period. Thus, Pretium's failure to collect the required number of storm water samples during each reporting period violates the Industrial General Permit.

Finally, the Industrial General Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Based on information available to Coastkeeper and CERF, including the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, and failure to collect the required number of storm water samples, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise a MIP, in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owners and/or Operators have been in

---

[64] SWPPP, p. 7.
[65] See 2015 & 2020 Permits § XI.B.5.b

daily and continuous violation of the Industrial General Permit MIP requirements since at least December 7, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. Pretium is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.6. <u>Failure to Comply with the Industrial General Permit's Reporting Requirements</u>.

The 2015 and 2020 Permits require dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the Permit, (2) an explanation for any noncompliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. 2015 & 2020 Permits § XVI. The Industrial General Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy.[66]

In each Annual Report, the Facility Owners and/or Operators certify that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the Industrial General Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Industrial General Permit, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both."[67]

The Facility Owners and/or Operators have submitted multiple annual reports which were certified attesting to the Facility's compliance with the terms of the Industrial General Permit. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. As discussed throughout Section 3 of this Notice Letter, the Facility has violated, and continues to violate, numerous provision of the Industrial General Permit. The Facility's Legally Responsible Person (LRP) knew or should have known the Facility failed to comply with numerous procedural and substantive provisions of the Industrial General Permit, and thus certifications of these annual reports were erroneous. Likewise, the LRP's justification for the Facility's failure to obtain samples during QSEs is false in light of the Facility's 24-7 scheduled operating hours and numerous rain events during the relevant time period.[68]

Because Pretium has failed to comply with the Industrial General Permit's reporting requirements and falsified reports and certification, the Facility is in daily violation of the Industrial General Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Industrial General Permit is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act,

---

[66] 2015 & 2020 Permits § XXI.K.
[67] 2015 & 2020 Permits § XXI.N.
[68] *See*, Ex. 2.

33 U.S.C. § 1311(a). Pretium has been in daily and continuous violation of the Industrial General Permit's reporting requirements every day since at least December 7, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. Pretium is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.7. <u>Failure to Comply with Plastic Materials Special Requirements</u>.

The 2015 and 2020 Permits require dischargers that handle Plastic Materials[69] to implement BMPs to eliminate discharges of plastic in storm water in addition to all other requirements of the Permit.[70] In lieu of the preferred treatment control BMPs, Pretium selected alternative BMPs listed in Permit Section XVIII.A.2.b. to prevent the discharge of plastic pollutants to stormwater pathways.[71] However, Pretium has neither implemented its BMPs nor shown that its BMPs are effective at preventing the discharge of Plastic Materials. As reflected above, nurdles were found in the Facility's storm water discharge. Likewise, Plastic Materials were documented near the Facility's trash cans during City of Escondido inspections. The Facility has never sampled any QSEs and likely never conducted visual observations during rain events. CERF volunteers did not see any Pretium employees conducting visual observations during the October 25, 2021 QSE despite the presence of nurdles in the Facility's storm water discharge.

As a result, the Facility's BMPs do not equate to or exceed the performance requirements of a containment system.[72] The Facility has also failed to establish that the containment system is infeasible pursuant to 2015 & 2020 Permits § XVIII.A.1.b. Two of the Facility's discharge points (Outfalls 1 and 2) could readily be outfitted with containment systems designed to trap articles retained by a 1mm mesh screen.

Because Pretium has failed to comply with the Industrial General Permit's Plastic Materials Special Requirements, the Facility is in daily violation of the Industrial General Permit. Every day Pretium conducts operations at the Facility without implementing the Plastic Materials Special Requirements as required by the Industrial General Permit is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Pretium has been in daily and continuous violation of the Industrial General Permit's Plastic Materials Special Requirements every day since at least December 7, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. Pretium is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

---

[69] "Plastic Materials are virgin and recycled plastic resin pellets, powders, flakes, powdered additives, regrind, dust, and other similar types of preproduction plastics with the potential to discharge or migrate off-site." 2015 & 2020 Permits § XVIII.A.

[70] 2015 & 2020 Permits § XVIII.A

[71] SWPPP, pp. 22-24.

[72] 2015 & 2020 Permits § XVIII.A.2.

## 4.  RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of $56,460.00 per day per violation for violations that occurred after November 2, 2015 and assessed on or after December 23, 2020.

In addition to civil penalties, Coastkeeper and CERF will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper and CERF will seek to recover their litigation costs, including attorneys' and experts' fees.

## 5.  CONCLUSION

Coastkeeper and CERF are willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper and CERF intend to file a citizen suit under Section 505(a) of the Clean Water Act for Pretium's violations of the Industrial General Permit.

If you wish to pursue settlement discussions, please contact Coastkeeper and CERFs legal counsel:

| San Diego Coastkeeper | Coastal Environmental Rights Foundation |
|---|---|
| Matt O'Malley<br>Patrick McDonough<br>matt@sdcoastkeeper.org<br>San Diego Coastkeeper<br>3900 Cleveland Ave Suite 102<br>San Diego, California 92103<br>Tel: 619-758-7743 | Marco Gonzalez<br>Livia Borak Beaudin<br>livia@coastlawgroup.com<br>Coast Law Group, LLP<br>1140 South Coast Highway 101<br>Encinitas, California 92024<br>Tel: 760-942-8505 |

Sincerely,

Matt O'Malley
Patrick McDonough
Attorneys for San Diego Coastkeeper

Marco Gonzalez
Livia Borak Beaudin
Attorneys for Coastal Environmental
Rights Foundation

## SERVICE LIST

<u>VIA U.S. MAIL</u>

David Gibson
Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Michael Regan, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Deborah Jordan
Acting Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

**Exhibit 1**

Storm Water Sampling Results from the Pretium Facility, 946 S. Andreasen, Escondido, CA

| No. | Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/EPA Benchmark |
|-----|---------------------------|-----------------|-----------|-------|--------|------------------------------|
| 1 | 10/25/21 | Outfall 1 | Zinc, Total | mg/L | .362 | 0.12[1, 3] |
| 2 | 10/25/21 | Outfall 1 | pH | SU | 5 | 6.5-8.5[2] |
| 3 | 10/25/21 | Outfall 1 | N+N | mg/L | 1.90 | 0.68[1]/1.0[2] |
| 4 | 10/25/21 | Outfall 1 | Phosphorus | mg/L | .37 | .1[2] |
| 5 | 10/25/21 | Outfall 2 | Copper | mg/L | .047 | 0.013[3] |
| 6 | 10/25/21 | Outfall 2 | Iron | Mg/L | .877 | 0.3[2] |
| 7 | 10/25/21 | Outfall 2 | Zinc, Total | mg/L | 1.62 | 0.12[1, 3] |
| 8 | 10/25/21 | Outfall 2 | N+N | mg/L | 1.99 | 0.68[1]/1.0[2] |
| 9 | 10/25/21 | Outfall 2 | Phosphorus | mg/L | .59 | .1[2] |
| 10 | 10/25/21 | Outfall 2 | pH | SU | 6 | 6.5-8.5[2] |

[1] EPA Benchmark
[2] Basin Plan Water Quality Objective
[3] California Toxics Rule Criteria

| STATION | NAME | LATITUDE | LONGITUDE | ELEVATION | DATE | DAPR | MDPR | PRCP |
|---------|------|----------|-----------|-----------|------|------|------|------|
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |

| STATION | NAME | LATITUDE | LONGITUDE | ELEVATION | DATE | DAPR | MDPR | PRCP |
|---------|------|----------|-----------|-----------|------|------|------|------|
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |

| STATION | NAME | LATITUDE | LONGITUDE | ELEVATION | DATE | DAPR | MDPR | PRCP |
|---------|------|----------|-----------|-----------|------|------|------|------|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |

| STATION | NAME | LATITUDE | LONGITUDE | ELEVATION | DATE | DAPR | MDPR | PRCP |
|---------|------|----------|-----------|-----------|------|------|------|------|
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |

| STATION | NAME | LATITUDE | LONGITUDE | ELEVATION | DATE | DAPR | MDPR | PRCP |
|---------|------|----------|-----------|-----------|------|------|------|------|
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | M |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

| STATION | NAME | LATITUDE | LONGITUDE | ELEVATION | DATE | DAPR | MDPR | PRCP |
|---------|------|----------|-----------|-----------|------|------|------|------|
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | M | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**EnviroMatrix**  **Analytical, Inc.**

22 November 2021

Coastal Environmental Rights Foundation                                    **EMA Log #: 21J0839**

Attn:  Livia Beaudin

1140 South Coast Highway 101

Encinitas, CA 92024

**Project:     Stormwater/October 26, 2021**

Enclosed are the results of analyses for samples received by the laboratory on 10/26/21 16:15.  Samples were analyzed pursuant to client request utilizing EPA or other ELAP approved methodologies.  I certify that this data is in compliance both technically and for completeness.

**Leland S. Pitt**

**Laboratory Director**

CA ELAP Certification #: 2564

### PLEASE NOTE OUR NEW LOCATION:

9590 Chesapeake Dr. - San Diego, California 92123 - (858) 560-7717 - Fax (858) 560-7763

**Analytical Chemistry Laboratory**

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  21J0839 |
|---|---|---|
| Project Name: | Stormwater | |

### ANALYTICAL REPORT FOR SAMPLES

| Sample ID | Laboratory ID | Matrix | Date Sampled | Date Received |
|---|---|---|---|---|
| Pretium 1 | 21J0839-01 | Stormwater | 10/25/21 15:40 | 10/26/21 16:15 |
| Pretium 2 | 21J0839-02 | Stormwater | 10/25/21 15:50 | 10/26/21 16:15 |
| Watkins O5 | 21J0839-03 | Stormwater | 10/25/21 16:39 | 10/26/21 16:15 |
| Watkins O11 | 21J0839-04 | Stormwater | 10/25/21 16:45 | 10/26/21 16:15 |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*

**EnviroMatrix**  **Analytical, Inc.**

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #: 21J0839 |
|---|---|---|
| Project Name: | Stormwater | |

## Total Metals by EPA 200 Series Methods

| Analyte | Result | MDL | Reporting Limit | Units | Dilution | Analyst | Batch | Sample Prepared Sample Analyzed | Method | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pretium 1 (21J0839-01) Stormwater   Sampled: 10/25/21 15:40   Received: 10/26/21 16:15** | | | | | | | | | | |
| Copper | **0.005** | 0.0002 | 0.010 | mg/l | 1 | icpms | 1111227 | 11/12/21 14:06 11/12/21 15:48 | EPA 200.8 | J |
| Iron | **0.188** | 0.002 | 0.050 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:48 | " | |
| Manganese | **0.010** | 0.0001 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:48 | " | |
| Lead | **0.0005** | 0.0001 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:48 | " | J |
| Selenium | ND | 0.004 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:48 | " | |
| Zinc | **0.362** | 0.0003 | 0.020 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:48 | " | |
| **Pretium 2 (21J0839-02) Stormwater   Sampled: 10/25/21 15:50   Received: 10/26/21 16:15** | | | | | | | | | | |
| Copper | **0.047** | 0.0002 | 0.010 | mg/l | 1 | icpms | 1111227 | 11/12/21 14:06 11/12/21 15:50 | EPA 200.8 | |
| Iron | **0.877** | 0.002 | 0.050 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:50 | " | |
| Manganese | **0.030** | 0.0001 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:50 | " | |
| Lead | **0.003** | 0.0001 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:50 | " | J |
| Selenium | ND | 0.004 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:50 | " | |
| Zinc | **1.62** | 0.0003 | 0.020 | " | " | icpms | " | 11/12/21 14:06 11/12/21 15:50 | " | |
| **Watkins O5 (21J0839-03) Stormwater   Sampled: 10/25/21 16:39   Received: 10/26/21 16:15** | | | | | | | | | | |
| Copper | **0.012** | 0.0002 | 0.010 | mg/l | 1 | icpms | 1111227 | 11/12/21 14:06 11/12/21 16:02 | EPA 200.8 | |
| Iron | **0.734** | 0.002 | 0.050 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:02 | " | |
| Manganese | **0.036** | 0.0001 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:02 | " | |
| Lead | **0.001** | 0.0001 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:02 | " | J |
| Selenium | ND | 0.004 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:02 | " | |
| Zinc | **0.169** | 0.0003 | 0.020 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:02 | " | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*

**EnviroMatrix** **EMA** **Analytical, Inc.**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Client Name: | Coastal Environmental Rights Foundation | | | | | | | **EMA Log #:  21J0839** | | |
| Project Name: | Stormwater | | | | | | | | | |

## Total Metals by EPA 200 Series Methods

| Analyte | Result | MDL | Reporting Limit | Units | Dilution | Analyst | Batch | Sample Prepared Sample Analyzed | Method | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Watkins O11 (21J0839-04) Stormwater   Sampled: 10/25/21 16:45   Received: 10/26/21 16:15** | | | | | | | | | | |
| **Copper** | **0.013** | 0.0002 | 0.010 | mg/l | 1 | icpms | 1111227 | 11/12/21 14:06 11/12/21 16:04 | EPA 200.8 | |
| **Iron** | **0.168** | 0.002 | 0.050 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:04 | " | |
| **Manganese** | **0.012** | 0.0001 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:04 | " | |
| **Lead** | **0.0006** | 0.0001 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:04 | " | J |
| Selenium | ND | 0.004 | 0.005 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:04 | " | |
| **Zinc** | **0.270** | 0.0003 | 0.020 | " | " | icpms | " | 11/12/21 14:06 11/12/21 16:04 | " | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



**EnviroMatrix** **Analytical, Inc.**

| Client Name: | Coastal Environmental Rights Foundation | | EMA Log #:  21J0839 |
| Project Name: | Stormwater | | |

### Conventional Chemistry Parameters by Standard/EPA Methods

| Analyte | Result | MDL | Reporting Limit | Units | Dilution | Analyst | Batch | Sample Prepared Sample Analyzed | Method | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pretium 1 (21J0839-01) Stormwater   Sampled: 10/25/21 15:40   Received: 10/26/21 16:15** | | | | | | | | | | |
| Nitrate/Nitrite as N | **1.90** | 0.04 | 0.25 | mg/l | 5 | SF | 1110507 | 11/05/21 08:26 11/09/21 09:02 | EPA 353.2 | |
| Phosphorus, Total | **0.37** | 0.02 | 0.05 | " | 1 | SF | 1110939 | 11/10/21 12:00 11/10/21 12:00 | SM4500 P B, E | |
| Total Dissolved Solids | **75.0** | 1.0 | 20.0 | " | " | NP | 1102748 | 10/27/21 17:01 10/29/21 15:36 | SM2540 C | |
| Total Suspended Solids | **1.0** | 1.0 | 20.0 | " | " | NP | 1102747 | 10/27/21 16:58 10/28/21 17:13 | SM2540 D | J |
| **Pretium 2 (21J0839-02) Stormwater   Sampled: 10/25/21 15:50   Received: 10/26/21 16:15** | | | | | | | | | | |
| Nitrate/Nitrite as N | **1.99** | 0.04 | 0.25 | mg/l | 5 | SF | 1110507 | 11/05/21 08:26 11/09/21 09:02 | EPA 353.2 | |
| Phosphorus, Total | **0.59** | 0.02 | 0.05 | " | 1 | SF | 1110939 | 11/10/21 12:00 11/10/21 12:00 | SM4500 P B, E | |
| Total Dissolved Solids | **69.0** | 1.0 | 20.0 | " | " | NP | 1102748 | 10/27/21 17:01 10/29/21 15:36 | SM2540 C | |
| Total Suspended Solids | **19.0** | 1.0 | 20.0 | " | " | NP | 1102747 | 10/27/21 16:58 10/28/21 17:13 | SM2540 D | J |
| **Watkins O5 (21J0839-03) Stormwater   Sampled: 10/25/21 16:39   Received: 10/26/21 16:15** | | | | | | | | | | |
| Nitrate/Nitrite as N | **0.51** | 0.009 | 0.05 | mg/l | 1 | SF | 1110507 | 11/05/21 08:26 11/09/21 09:02 | EPA 353.2 | |
| Phosphorus, Total | **0.45** | 0.02 | 0.05 | " | " | SF | 1110939 | 11/10/21 12:00 11/10/21 12:00 | SM4500 P B, E | |
| Total Dissolved Solids | **124** | 1.0 | 20.0 | " | " | NP | 1102748 | 10/27/21 17:01 10/29/21 15:36 | SM2540 C | |
| Total Suspended Solids | **21.0** | 1.0 | 20.0 | " | " | NP | 1102747 | 10/27/21 16:58 10/28/21 17:13 | SM2540 D | |
| **Watkins O11 (21J0839-04) Stormwater   Sampled: 10/25/21 16:45   Received: 10/26/21 16:15** | | | | | | | | | | |
| Nitrate/Nitrite as N | **0.34** | 0.009 | 0.05 | mg/l | 1 | SF | 1110507 | 11/05/21 08:26 11/09/21 09:02 | EPA 353.2 | |
| Phosphorus, Total | **0.10** | 0.02 | 0.05 | " | " | SF | 1110939 | 11/10/21 12:00 11/10/21 12:00 | SM4500 P B, E | |
| Total Dissolved Solids | **44.0** | 1.0 | 20.0 | " | " | NP | 1102748 | 10/27/21 17:01 10/29/21 15:36 | SM2540 C | |
| Total Suspended Solids | **5.0** | 1.0 | 20.0 | " | " | NP | 1102747 | 10/27/21 16:58 10/28/21 17:13 | SM2540 D | J |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix **EMA** Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  21J0839 |
|---|---|---|
| Project Name: | Stormwater | |

## Total Metals by EPA 200 Series Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1111227** | | | | | | | | | | | | |
| **Blank (1111227-BLK1)** | | | | | Prepared & Analyzed: 11/12/21 | | | | | | | |
| Selenium | ND | 0.004 | 0.005 | mg/l | icpms | | | | | | | |
| Manganese | ND | 0.0001 | 0.005 | " | icpms | | | | | | | |
| Lead | ND | 0.0001 | 0.005 | " | icpms | | | | | | | |
| Iron | ND | 0.002 | 0.050 | " | icpms | | | | | | | |
| Zinc | ND | 0.0003 | 0.020 | " | icpms | | | | | | | |
| Copper | ND | 0.0002 | 0.010 | " | icpms | | | | | | | |
| **LCS (1111227-BS1)** | | | | | Prepared & Analyzed: 11/12/21 | | | | | | | |
| Iron | 0.099 | 0.002 | 0.050 | mg/l | icpms | 0.100 | | 99 | 85-115 | | | |
| Manganese | 0.098 | 0.0001 | 0.005 | " | icpms | 0.100 | | 98 | 85-115 | | | |
| Copper | 0.101 | 0.0002 | 0.010 | " | icpms | 0.100 | | 101 | 85-115 | | | |
| Lead | 0.105 | 0.0001 | 0.005 | " | icpms | 0.100 | | 105 | 85-115 | | | |
| Selenium | 0.118 | 0.004 | 0.005 | " | icpms | 0.100 | | 118 | 75-125 | | | |
| Zinc | 0.111 | 0.0003 | 0.020 | " | icpms | 0.100 | | 111 | 85-115 | | | |
| **LCS Dup (1111227-BSD1)** | | | | | Prepared & Analyzed: 11/12/21 | | | | | | | |
| Lead | 0.102 | 0.0001 | 0.005 | mg/l | icpms | 0.100 | | 102 | 85-115 | 3 | 20 | |
| Manganese | 0.097 | 0.0001 | 0.005 | " | icpms | 0.100 | | 97 | 85-115 | 0.6 | 20 | |
| Selenium | 0.116 | 0.004 | 0.005 | " | icpms | 0.100 | | 116 | 75-125 | 1 | 20 | |
| Copper | 0.098 | 0.0002 | 0.010 | " | icpms | 0.100 | | 98 | 85-115 | 3 | 20 | |
| Zinc | 0.110 | 0.0003 | 0.020 | " | icpms | 0.100 | | 110 | 85-115 | 1 | 20 | |
| Iron | 0.099 | 0.002 | 0.050 | " | icpms | 0.100 | | 99 | 85-115 | 0.2 | 20 | |
| **Duplicate (1111227-DUP1)** | | | **Source: 21J0820-01** | | Prepared & Analyzed: 11/12/21 | | | | | | | |
| Zinc | 0.142 | 0.0003 | 0.020 | mg/l | icpms | | 0.152 | | | 7 | 20 | |
| Iron | 0.142 | 0.002 | 0.050 | " | icpms | | 0.145 | | | 2 | 20 | |
| Lead | 0.0004 | 0.0001 | 0.005 | " | icpms | | 0.0003 | | | 7 | 20 | J |
| Selenium | ND | 0.004 | 0.005 | " | icpms | | ND | | | | 20 | |
| Copper | 0.007 | 0.0002 | 0.010 | " | icpms | | 0.006 | | | 14 | 20 | J |
| Manganese | 0.007 | 0.0001 | 0.005 | " | icpms | | 0.007 | | | 7 | 20 | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix **EMA** Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #: 21J0839 |
|---|---|---|
| Project Name: | Stormwater | |

## Total Metals by EPA 200 Series Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1111227** | | | | | | | | | | | | |
| **Matrix Spike (1111227-MS1)** | | | **Source: 21J0820-01** | | Prepared & Analyzed: 11/12/21 | | | | | | | |
| Copper | 0.102 | 0.0002 | 0.010 | mg/l | icpms | 0.100 | 0.006 | 96 | 70-130 | | | |
| Iron | 0.236 | 0.002 | 0.050 | " | icpms | 0.100 | 0.145 | 92 | 70-130 | | | |
| Manganese | 0.103 | 0.0001 | 0.005 | " | icpms | 0.100 | 0.007 | 95 | 70-130 | | | |
| Zinc | 0.251 | 0.0003 | 0.020 | " | icpms | 0.100 | 0.152 | 99 | 70-130 | | | |
| Selenium | 0.117 | 0.004 | 0.005 | " | icpms | 0.100 | ND | 117 | 75-125 | | | |
| Lead | 0.102 | 0.0001 | 0.005 | " | icpms | 0.100 | 0.0003 | 102 | 70-130 | | | |
| **Matrix Spike (1111227-MS2)** | | | **Source: 21J0820-02** | | Prepared & Analyzed: 11/12/21 | | | | | | | |
| Iron | 0.205 | 0.002 | 0.050 | mg/l | icpms | 0.100 | 0.203 | 2 | 70-130 | | | QM-05 |
| Zinc | 0.188 | 0.0003 | 0.020 | " | icpms | 0.100 | 0.080 | 108 | 70-130 | | | |
| Selenium | 0.117 | 0.004 | 0.005 | " | icpms | 0.100 | ND | 117 | 75-125 | | | |
| Copper | 0.099 | 0.0002 | 0.010 | " | icpms | 0.100 | 0.004 | 95 | 70-130 | | | |
| Manganese | 0.100 | 0.0001 | 0.005 | " | icpms | 0.100 | 0.004 | 96 | 70-130 | | | |
| Lead | 0.101 | 0.0001 | 0.005 | " | icpms | 0.100 | 0.0003 | 101 | 70-130 | | | |
| **Matrix Spike Dup (1111227-MSD1)** | | | **Source: 21J0820-01** | | Prepared & Analyzed: 11/12/21 | | | | | | | |
| Lead | 0.103 | 0.0001 | 0.005 | mg/l | icpms | 0.100 | 0.0003 | 102 | 70-130 | 0.4 | 20 | |
| Iron | 0.237 | 0.002 | 0.050 | " | icpms | 0.100 | 0.145 | 93 | 70-130 | 0.4 | 20 | |
| Zinc | 0.250 | 0.0003 | 0.020 | " | icpms | 0.100 | 0.152 | 99 | 70-130 | 0.3 | 20 | |
| Manganese | 0.102 | 0.0001 | 0.005 | " | icpms | 0.100 | 0.007 | 94 | 70-130 | 1 | 20 | |
| Copper | 0.100 | 0.0002 | 0.010 | " | icpms | 0.100 | 0.006 | 95 | 70-130 | 2 | 20 | |
| Selenium | 0.117 | 0.004 | 0.005 | " | icpms | 0.100 | ND | 117 | 75-125 | 0.2 | 20 | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*

 EnviroMatrix Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  21J0839 |
|---|---|---|
| Project Name: | Stormwater | |

## Conventional Chemistry Parameters by Standard/EPA Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1102747** | | | | | | | | | | | | |
| **Blank (1102747-BLK1)** | | | | | Prepared: 10/27/21  Analyzed: 10/28/21 | | | | | | | |
| Total Suspended Solids | ND | 1.0 | 20.0 | mg/l | NP | | | | | | | |
| **Duplicate (1102747-DUP1)** | | | **Source: 21J0820-04** | | Prepared: 10/27/21  Analyzed: 10/28/21 | | | | | | | |
| Total Suspended Solids | 18.0 | 1.0 | 20.0 | mg/l | NP | | 20.0 | | | 11 | 20 | J |
| **Reference (1102747-SRM1)** | | | | | Prepared: 10/27/21  Analyzed: 10/28/21 | | | | | | | |
| Total Suspended Solids | 100 | 1.0 | 20.0 | mg/l | NP | 100 | | 100 | 77.1-110 | | | |
| **Batch 1102748** | | | | | | | | | | | | |
| **Blank (1102748-BLK1)** | | | | | Prepared: 10/27/21  Analyzed: 10/29/21 | | | | | | | |
| Total Dissolved Solids | ND | 1.0 | 20.0 | mg/l | NP | | | | | | | |
| **Duplicate (1102748-DUP1)** | | | **Source: 21J0820-04** | | Prepared: 10/27/21  Analyzed: 10/29/21 | | | | | | | |
| Total Dissolved Solids | 104 | 1.0 | 20.0 | mg/l | NP | | 106 | | | 2 | 20 | |
| **Reference (1102748-SRM1)** | | | | | Prepared: 10/27/21  Analyzed: 10/29/21 | | | | | | | |
| Total Dissolved Solids | 390 | 1.0 | 20.0 | mg/l | NP | 395 | | 99 | 88.61-111.39 | | | |
| **Batch 1110507** | | | | | | | | | | | | |
| **Blank (1110507-BLK1)** | | | | | Prepared: 11/05/21  Analyzed: 11/09/21 | | | | | | | |
| Nitrate/Nitrite as N | ND | 0.009 | 0.05 | mg/l | SF | | | | | | | |
| **LCS (1110507-BS1)** | | | | | Prepared: 11/05/21  Analyzed: 11/09/21 | | | | | | | |
| Nitrate/Nitrite as N | 0.48 | 0.009 | 0.05 | mg/l | SF | 0.500 | | 96 | 90-110 | | | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  21J0839 |
|---|---|---|
| Project Name: | Stormwater | |

## Conventional Chemistry Parameters by Standard/EPA Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1110507** | | | | | | | | | | | | |
| **LCS Dup (1110507-BSD1)** | | | | | Prepared: 11/05/21 | Analyzed: 11/09/21 | | | | | | |
| Nitrate/Nitrite as N | 0.49 | 0.009 | 0.05 | mg/l | SF | 0.500 | | 98 | 90-110 | 1 | 20 | |
| **Duplicate (1110507-DUP1)** | | | **Source: 21K0195-15** | | Prepared: 11/05/21 | Analyzed: 11/09/21 | | | | | | |
| Nitrate/Nitrite as N | 1.82 | 0.02 | 0.10 | mg/l | SF | | 1.83 | | | 0.2 | 20 | |
| **Matrix Spike (1110507-MS1)** | | | **Source: 21K0195-15** | | Prepared: 11/05/21 | Analyzed: 11/09/21 | | | | | | |
| Nitrate/Nitrite as N | 3.74 | 0.04 | 0.20 | mg/l | SF | 2.00 | 1.83 | 96 | 90-110 | | | |
| **Matrix Spike Dup (1110507-MSD1)** | | | **Source: 21K0195-15** | | Prepared: 11/05/21 | Analyzed: 11/09/21 | | | | | | |
| Nitrate/Nitrite as N | 3.78 | 0.04 | 0.20 | mg/l | SF | 2.00 | 1.83 | 98 | 90-110 | 1 | 20 | |
| **Batch 1110939** | | | | | | | | | | | | |
| **Blank (1110939-BLK1)** | | | | | Prepared & Analyzed: 11/10/21 | | | | | | | |
| Phosphorus, Total | ND | 0.02 | 0.05 | mg/l | SF | | | | | | | |
| **LCS (1110939-BS1)** | | | | | Prepared & Analyzed: 11/10/21 | | | | | | | |
| Phosphorus, Total | 0.54 | 0.02 | 0.05 | mg/l | SF | 0.500 | | 108 | 80-120 | | | |
| **LCS Dup (1110939-BSD1)** | | | | | Prepared & Analyzed: 11/10/21 | | | | | | | |
| Phosphorus, Total | 0.50 | 0.02 | 0.05 | mg/l | SF | 0.500 | | 100 | 80-120 | 8 | 20 | |
| **Duplicate (1110939-DUP1)** | | | **Source: 21K0104-02** | | Prepared & Analyzed: 11/10/21 | | | | | | | |
| Phosphorus, Total | 0.08 | 0.02 | 0.05 | mg/l | SF | | 0.09 | | | 7 | 20 | |
| **Matrix Spike (1110939-MS1)** | | | **Source: 21K0104-02** | | Prepared & Analyzed: 11/10/21 | | | | | | | |
| Phosphorus, Total | 0.58 | 0.02 | 0.05 | mg/l | SF | 0.500 | 0.09 | 99 | 80-120 | | | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix **EMA** Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  21J0839 |
|---|---|---|
| Project Name: | Stormwater | |

## Conventional Chemistry Parameters by Standard/EPA Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1110939** | | | | | | | | | | | | |
| **Matrix Spike Dup (1110939-MSD1)** | | | **Source: 21K0104-02** | | Prepared & Analyzed: 11/10/21 | | | | | | | |
| Phosphorus, Total | 0.59 | 0.02 | 0.05 | mg/l | SF | 0.500 | 0.09 | 100 | 80-120 | 1 | 20 | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*


EnviroMatrix **EMA** Analytical, Inc.

| Client Name: Coastal Environmental Rights Foundation | EMA Log #:  21J0839 |
|---|---|
| Project Name: Stormwater | |

### Notes and Definitions

QM-05       The spike recovery was outside acceptance limits for the MS and/or MSD due to matrix interference. The LCS and/or LCSD were within acceptance limits showing that the laboratory is in control and the data is acceptable.

J             Detected but below the Reporting Limit; therefore, result is an estimated concentration (CLP J-Flag).

ND            Analyte NOT DETECTED at or above the reporting limit (or method detection limit when specified)

NR            Not Reported

dry           Sample results reported on a dry weight basis (if indicated in units column)

RPD           Relative Percent Difference

MDL           Method detection limit (indicated per client's request)

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*

EnviroMatrix  Analytical, Inc.

**EnviroMatrix Analytical, Inc.**

4340 Viewridge Ave., Ste. A · San Diego, CA 92123 · Phone (858) 560-7717 · Fax (858) 560-7763

# CHAIN-OF-CUSTODY RECORD

COC LOG #: 215083C

Client: Coastal Environmental Rights Foundation
Attn: Livia Beaudin
Sampler(s): Livia Beaudin
Address: 1140 South Coast Highway 101
Encinitas CA 92024
Phone: 760/942-8505    Fax: 760/942-8515
Email: livia@coastlaw.com
Billing Address: 1140 South Coast Highway 101
Encinitas CA 92024
Project ID:
Project #:

PO #:

**Requested Analysis**

| ID# | Client Sample ID | Sample Date | Sample Time | Sample Matrix | Container # / Type | Oil & Grease / 413.1 413.2 1664 | 8015 (TPH) □ Gas □ Diesel □ Ext | 624/8260 (VOC) Full BTXE MTBE Oxy Nap | 625 / 8270 (SVOC) □ PAH only | 608 / 8081 (Organochlorine Pesticides) | 608 / 8082 (Polychlorinated Biphenyls) | 8141 (Organophosphorus Pesticides) | TBT (Organotin Compounds) | pH EC TSS TDS | Nitrate N · Nitrite N · TKN OHP Phosphorus | CAC Title 22/CAM17 Metals □ TTLC □ STI | TCLP (RCRA) □ Metals □ Organics | Cd Cr Cu Pb Ni Ag Zn Dissolved | Coliform, Total (MTF) □ Fecal (MTF) | Coliform, T·E.Coli □ P/A □ Enumeration | Enterococcus · MTF □ Enterolert | Heterotrophic Plate Count (HPC) | BOD □ COD □ Cyanide | Fe, Se, Mn, EPA 200.8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Pretium 1 | 10/25/2021 | 3:40 PM | SW | 3 | X | | | | | | | | X | X | | | | | | | | | |
| 2 | Pretium 2 | 10/25/2021 | 3:50 PM | SW | 3 | | | | | | | | | X | X | | | X | | | | | | X |
| 3 | Watkins O5 | 10/25/2021 | 4:39 PM | SW | 3 | | | | | | | | | X | X | | | X | | | | | | X |
| 4 | Watkins O11 | 10/25/2021 | 4:45 PM | SW | 3 | | | | | | | | | X | X | | | X | | | | | | X |

**Matrix Codes**: A – Air, DW – Drinking Water, GW – Groundwater, SW – Storm Water
WW – Wastewater, S – Soil, SED – Sediment, SD – Solid, T – Tissue, O – Oil, L – Liquid
**Shipped By**: □ Courier □ UPS □ FedEx □ USPS ☒ Client Drop Off □ Other
**Turn-Around-Time**: □ Same Day □ 1 day □ 2 day □ 3 day □ 4 day □ 5 day ☒ 10 (7-business days)
**Reporting Requirements**: □ Fax ☒ PDF □ Excel □ Geotracker(EDF □ Hand Copy □ EDT □ CEDEN □ SDWIS
**Sample Disposal**: ☒ Lab Laboratory □ Return to Client · PU or Delivery □ Archive

**Sample Integrity**
Correct Containers: (Yes) No N/A
Custody Seals Intact: Yes No (N/A)
COC Labels Agree: Yes (No) N/A
Containers Properly Preserved: (Yes) No N/A
Temp @ Receipt ____
Sampled By: (EMA) Client EMA Autosampler
Project/Sample Location/Address:

| RELINQUISHED BY | DATE/TIME | RECEIVED BY |
|---|---|---|
| Signature | 10/24/22-21 | Signature |
| Print Livia Beaudin | | Print Brian Tellen |
| Company CERF | | Company Coast Law Grp |
| Signature | 10/24/21 10:30 AM | Signature |
| Print | | Print Merve Deda |
| Company | 1415 | Company EMA |
| Signature | | Signature |
| Print | | Print |
| Company | | Company |

Pretium 1 pH = 5    Pretium 2 pH = 6    Watkins O5 pH = 6    Watkins O11 pH = 7

**Project/Sample Comments:**

*Additional tests may apply – Please note these as a SAP statement charge for all client.*

*TAT (1) excess the right to reject any samples that do not match our testing profile.*

*TAT (2) for expediting samples to TAT, Inc., client agrees to pay for the services requested in that COC form and any additional analyses performed on this project. Payment for services is due within 30 days from date of invoice. Sample will be disposed of 7 days after report has been finalized unless otherwise noted. All work is subject to EMA's terms and conditions.*

Page 1 of 1